PURCELL et al. v. UNITED STATES et al.

No. 1376.

District Court, D. Maryland.

Oct. 13, 1941.

310

Joseph Sherbow, of Baltimore, Md., for Public Service Commission.

Miles & O'Brien and Clarence W. Miles and Benjamin C. Howard, all of Baltimore, Md. for McCullough Coal Co.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., Robert L. Pierce, of Washington, D. C., and Elliott Finkel, of Pittsburgh, Pa., for the United States.

Charles R. Webber, of Baltimore, Md., and John E. Evans, Sr., of Pittsburgh, Pa., for Baltimore & O. R. Co. and another.

D. H. Kunkel, of Washington, D. C., for Interstate Commerce Commission.

Before SOPER, Circuit Judge, and COLEMAN and WAY, District Judges.

SOPER, Circuit Judge.

This suit is instituted under the provisions of the Act of Congress of October 22, 1913, as amended, 28 U.S.C.A. §§ 41 (28), 43–45, 45a, 46, 47, 48, to enjoin the operation and effect of an order of the Interstate Commerce Commission dated September 2, 1941, whereby the abandonment of a line of railroad extending 19.79 miles from Confluence and Oakland Junction, Pennsylvania, to Kendall, Maryland, was authorized. The plaintiffs in the suit are the Public Service Commission of Maryland and the McCullough Coal Corporation, a Maryland corporation, which owns a coal mine in Maryland that will be adversely affected if the line of railroad is discontinued. The defendants are the United States and the Confluence and Oakland Railroad Company, a railroad corporation under the laws of Maryland and Pennsylvania, which owns the line of railroad in question, and the Baltimore and Ohio Railroad Company, a Maryland corporation, which operates the railroad as lessee. The Confluence and Oakland Railroad Company is a totally owned subsidiary of the Baltimore and Ohio Railroad Company.

Application was made by the carriers to the Interstate Commerce Commission, under Section 1(18) of the Interstate Commerce Act, 49 U.S.C.A. § 1(18), for a certificate that the present and future public convenience and necessity permit the abandonment and removal of the line. The reasons given for the proposal were that the United States, acting through the War Department, proposes to construct a flood control dam on the Youghiogheny River about three miles above Confluence, Pennsylvania, which will require the abandonment of the railroad's entire line because it will be submerged for a distance of approximately 12 of its 19.79 miles, and the remainder of the line will become a detached segment without rail connection with any other railroad and will thus become valueless; and that the relocation of the line would require an expenditure that is not justified by the present and prospective revenues of the line, and would constitute an undue burden on interstate commerce without compensating advantage. The application also showed that the carriers had given an option to the United States for a period of 365 days to purchase the railroad for $306,000 (the Railroad Company reserving the right to salvage and remove the rail and other material), subject to the approval and authorization by the Commission of the abandonment of the line. Testimony was taken before an

examiner and before Division 4 of the Commission, which found for the carriers in a report of March 6, 1941. Thereupon the McCullough Coal Corporation and the Public Service Commission of Maryland asked a reconsideration on the ground that there was no substantial evidence to support the issuance of the certificate of abandonment, and that the Interstate Commerce Commission was without jurisdiction to grant it. The matter was then heard by the Commission as a whole, and the decision of Division 4 was affirmed.

The facts as found by Division 4 of the Commission, and approved on reargument by the Commission as a whole, may be summarized as follows: The railroad runs through a semi-mountainous section following generally Youghiogheny River as far as Kendall. As of December 31, 1936, the original cost to date of the property, exclusive of land and of improvement assessments, was $398,873; and the cost of reproduction less depreciation, and the value of the land, were estimated by the Bureau of Valuation of the Commission to be $350,074 and $8,717 respectively. The carriers estimated the net salvage value of the recoverable property to be $25,965.

During the last five years, train service has consisted of a mixed train in each direction on Tuesdays and Saturdays. The stations along the line are not served by any other railroad. The population, embraced within an area of one-half mile on both sides of the line, is estimated to be 2,000. Farming is carried on to a limited extent. One coal mine, located between Friendsville and Kendall, and operated by the McCullough Coal Corporation, is the only industry of any importance. United States Highway 40 and a paved State highway cross the line at Somerfield and Friendsville, respectively. Improved State highways also parallel it at a substantial distance on each side. Secondary roads traverse the area and afford connections with these highways. No common carrier bus or truck service operates in the immediate territory except at Friendsville, which is served by a truck line operating from Cumberland. Deliveries are made to all points, however, by local and private trucks operating mainly out of Confluence and Somerfield.

The line has been operated at a profit. Setting out the figures with regard to the traffic handled and the revenues received during the years 1934–1939, Division 4 of the Commission found: "Assuming that the system cost of handling traffic originating on or destined to points on the line amounted to 50 percent of the revenues therefrom, the system profits from such traffic during each of the periods referred to would have been $17,908, $17,544, $27,527, $23,098, $17,764, and $32,769, which, when offset by losses directly attributed to line operations, would result in net system profits of $8,875, $8,634, $18,351, $9,018, $6,412 and $23,079. Using a 25 percent operating factor claimed by the protestant to be more representative of the actual cost of handling line traffic over other parts of the system, the profit to the system for the same periods would have been $17,830, $17,406, $32,115, $20,567, $15,304, and $39,463." The report of the Commission added that if operating ratios ranging from 73 to 78 percent are used the average annual profit was $1,125. The final conclusion of the Commission on this aspect of the case was that there was no evidence that the line involved had theretofore been a burden on the system, or that the volume of traffic last reported would not continue if the line remained undisturbed.

With regard to the business of the McCullough Coal Corporation and the effect upon it of an abandonment of the railroad, the Commission made the following finding:

"The McCullough Coal Corporation, hereinafter referred to as the coal company, owner of bituminous-coal lands and rights, whose mine opening and loading facilities adjoin the right-of-way beyond the flooded area, protests the proposal because it would be deprived of direct rail connections. The record shows that practically the company's entire production is shipped by rail to nearby eastern points. In case the line is abandoned it would be necessary to use motortrucks between the mine and the nearest railhead at Grantsville, at a cost of about $1.12 a ton. Under such circumstances, the mine would be forced to close down because of inability to compete with other mines more favorably located. Trucks are used now for local deliveries only. Coal shipments averaged 27,211 tons annually during the 1921–33 period and 22,386 tons during 1934–39. This latter average is about 994 tons a year more than the outbound shipments reported by the applicants. Shipments have fluctuated each year since 1933, when a serious fire curtailed production.

Shipments averaged about 9,086 tons annually during the period 1933–35, 27,728 tons in 1936–37. In 1938 the volume handled was 17,632 tons, and in 1939, 40,-243 tons. The large increase in the 1939 tonnage is claimed by the applicants to result from a suspension of operations in the unionized bituminous coal fields during April and May of that year."

The witnesses gave various estimates as to the value of the property and mine of the coal corporation, of which the largest was $308,262.13.

The War Department is proceeding with the flood control project under the Flood Control Act of June 28, 1938, 52 Stat. 1215, 33 U.S.C.A. § 701b et seq. The Commission found that the plans of the Department provide for the relocation of all town sites, highways and other public facilities that will be inundated. Estimates submitted by the carriers and the War Department for relocation of the railroad line ranged from $2,018,000 to $2,519,000, while the estimate of the Coal Corporation indicated that a relocated line sufficient to carry the present traffic could be constructed for $800,000. Estimates made by the contesting parties indicated an increased cost of maintenance if the new line should be built. With respect to the relocation of the line the Commission said:

" * * * Even at the low operating cost urged by the coal company the net system profits annually since 1934 would not have been sufficient to produce a reasonable return upon an investment as low as $800,000."

* * * * *

"The benefits accruing to the public from continued rail transportation service, and the present and prospective needs of the public for such service commensurate with its ability to support a railroad, must be weighed against the loss and inconvenience which might be imposed upon interstate commerce. There is no evidence that the line involved herein has heretofore been a burden on the system or that the volume of traffic last reported would not continue to support it in the future if it remained undisturbed. However, the further existence of this line of railway is not possible in view of the need of the land for flood control, and it must give way to a superior public use. If the railroad service now being performed is to be continued the line must be relocated. Considering the expenditure necessarily incident to that relocation and the increased costs of operat-

ing the line that will be caused thereby, we conclude that we are not justified by the public convenience and necessity in taking action herein that will require the relocation of the line."

In its opinions the Commission also adverted to the public interest that will be served by erection of the dam. Thus, Division 4 said that it was a matter of common knowledge that catastrophes resulting from the uncontrolled flow of the river are not only a menace to the safety of train operation, but increase the cost thereof, and therefore the flood control project when completed will not only benefit the general public but also the railroads; and the subsequent report of the whole Commission stated that the question presented was whether consideration should be given to the broader interest of the general public in the proposed abandonment, or confined to that interest which relates solely to the transportation public concerned with the facilities of the line of railroad involved and its relationship to interstate commerce. On this point the Commission said:

" * * * It is not disputed that the flood-control program, of which the taking of the applicants' property is but a small part, will eventually benefit large number of persons, and including railroads, who, in the past, have suffered from the ravages of uncontrolled waters; that only a comparatively minor interest will be adversely affected by abandonment; that the purchase price to be paid by the Government is reasonable; and that the future of the line concerning traffic and profits therefrom is uncertain. In view of these facts, we conclude that the petitioner's contention is untenable, and that we are not restricted in our deliberations to the considerations indicated by the petitioner. Congress delegated to us the authority to ascertain the facts in these cases and to exercise thereon a judgment whether abandonment would be consistent with the public convenience and necessity.

From this conclusion a dissenting opinion was filed which took the position that the authority of the Commission under Section 1(18) of the statute is to determine whether lines of railroad should or should not be abandoned from the standpoint of the public interest as it relates to transportation; and that the Commission has no authority to go outside the field of transportation and pass judgment upon the question whether lines of railroad which are not an undue burden upon interstate commerce

should be abandoned because a superior public interest demands that they make way for a public improvement, such as the flood control project here involved.

It is not necessary in this case to decide in which of the Commission's opinions the extent of its authority is more correctly defined. It is true that Congress has given the power to other agencies to decide whether a flood control project that will interfere with the operation of a railroad shall be built; and that in a number of decisions the Supreme Court has held that the criterion to be applied by the Commission in the exercise of its authority is not the general public welfare, but the "adequacy of transportation service, to its essential conditions of economy and efficiency, and to appropriate provision and best use of transportation facilities." New York Central Securities Corp. v. United States, 287 U.S. 12, 25, 53 S.Ct. 45, 48, 77 L.Ed. 138; see, also, Colorado v. United States, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878; Texas v. United States, 292 U.S. 522, 54 S.Ct. 819, 78 L.Ed. 1402; United States v. Lowden, 308 U.S. 225, 60 S.Ct. 248, 84 L.Ed. 208. But we are primarily concerned with the question whether the action of the Commission in the instant case lay within its power, and the controversy will be simplified if the discussion is limited to that question. We are justified in doing this because it is obvious from an examination of the reports of the Commission as a whole that it was satisfied, irrespective of the general benefits expected to flow from flood control, that the large expenditure required to relocate the railroad and the increased cost of maintenance in the future would impose an unreasonable burden upon the parent corporation, and that the public convenience and necessity, with respect to transportation, would be served by the abandonment of the line.

The plaintiffs make the contention in this respect that the Commission is without power to permit the abandonment of an established branch road which is serving the public acceptably at a profit to itself; and further, if such a branch road is destroyed by a superior power, that the Commission cannot authorize its abandonment but must sanction its relocation, even though the cost thereof is so high as to preclude a fair return from future operations, provided that the operation of the entire railroad system, main line and branches, will produce a fair return to the carrier.

This contention is based upon certain decisions which relate to actions of State Legislatures or State Commissions, and hold that a railroad carrier may be required by public authority to do a particular act or operate a particular part of its system, unprofitable in itself, if performance does not involve the question of the profitableness of the operation of the railroad as an entirety. In such case, there is no deprivation of property without due process of law and the controlling authority has the power to consider the nature and extent of the carrier's business, its productiveness, the character of the service required, the public need for it and its effect upon the service already being rendered. If these criteria are reasonably applied, there is no abuse of power. Atlantic Coast Line R. Co. v. North Carolina Corp. Comm., 206 U.S. 1, 27 S.Ct. 585, 51 L.Ed. 933, 11 Ann.Cas. 398; Chesapeake & Ohio Ry. Co. v. Public Service Comm., 242 U.S. 603, 37 S.Ct. 234, 61 L.Ed. 520; Delaware, L. & W. R. Co. v. Van Santwood, D.C., 216 F. 252; Delaware, L. & W. R. Co. v. Van Santvoord, D.C., 232 F. 978.

It will be seen that these decisions do not lay down the absolute rule that the operation of a branch road at a loss must in all cases be continued if the system as a whole can be run at a profit; but the question is committed to the reasonable discretion of the controlling State authority. The power of the Interstate Commerce Commission within its field is no less. Section 1(18) of the Act provides that no carrier shall abandon any portion of a line of railroad or the operation thereof unless there shall first have been obtained from the Commission a certificate that the present or future convenience or necessity permit of such abandonment; and Section 1(20) provides that the Commission shall have power to issue such a certificate or to refuse it. The decisions already cited show that under these provisions it is left to the Commission to determine whether a proposed abandonment will further the interests of transportation by protecting interstate commerce from undue burdens, and in making this determination, for example, in such a case as ours, the Commission must consider the extent of the whole transportation and the dependence of the community affected upon the particular means of transportation which it is proposed to eliminate. The Commission's problem is to balance the respective interests and to decide whether

the injury to the community affected outweighs the burdens imposed upon the carrier; and the decision of the Commission is final if there is substantial evidence to support it. Interstate Commerce Comm. v. Louisville & N. R. Co., 227 U.S. 88, 33 S. Ct. 185, 57 L.Ed. 431; Florida v. United States, 282 U.S. 194, 51 S.Ct. 119, 75 L. Ed. 291.

■ Section 1(18), as we have seen, directs the Commission in making its determination in a case of abandonment to consider not only the present, but also the future public convenience and necessity; and in Transit Commission v. United States, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342, it was accordingly held that in deciding whether an unprofitable intrastate branch line should be abandoned, the Commission might properly take into consideration the magnitude of the outlay necessary to comply with a requirement of State authority that certain grade crossings on the branch line be abolished. In like manner the Commission in the instant case was not only authorized but required to take into account the unavoidable cessation of the carrier's branch line to make room for the project of flood control, and in so doing, to consider the high cost of relocation of the line and to decide whether, under all of the circumstances of potential traffic and expense, the public interest in respect to interstate transportation would be served by the continued operation of the road in a new location. The familiar problem of balancing conflicting interests was presented, which it was the province of the Commission to solve.

■ It was obviously in the interest of all concerned that the Commission make its decision in advance of the actual removal of the tracks and the flooding of the line, and this the Commission proceeded to do. It was said in the report of Division 4 of March 6, 1941, that the record showed that within one year the construction of the dam will have reached the point where appropriation of the carrier's land will be necessary, and the operation of the railroad must cease. The final order of the Commission of September 2, 1941, directed that the certificate of convenience and necessity become effective from and after 15 days. It was suggested during the argument before us that the order was premature in that it empowered the carriers to abandon the line before it was actually necessary, but this point was not urged by

the protestants before the Commission, or mentioned in their bill of complaint in the pending case. There is no showing that the time for the occupancy of the land is not now imminent. On the contrary we were told during the argument that the tracks must be removed within a month if the work upon the flood project is to proceed according to plan. These circumstances do not justify a stay of operation of the Commission's order for the short intervening period.

■ The plaintiffs further contend that under Section 2 of the Flood Control Act of 1938, 33 U.S.C.A. § 701c—1, the Secretary of War is authorized not only to acquire in the name of the United States title to the lands necessary for the dam with the funds appropriated for that purpose, but also to reimburse the owners for "highway, railway, and utility relocation". We are told that the consent of the Commission to the abandonment of the line upon the payment to the carrier of only the agreed value of its present line, unjustifiably relieves the United States of its obligation to pay for the relocation of the line and thereby damages the plaintiffs and other shippers in the area. It is questionable whether the reference in the section to relocation was directed to all owners of the needed lands, or was confined only to the reimbursement of "States, political subdivisions thereof or other responsible local agencies" for relocations which they might be required to make. However this may be, it is not and cannot be disputed that relocations of railroad lines may be made only with the consent of the Commission. It is the Commission's duty to make the decision, and it is immaterial whether the funds which the carriers propose to expend are to be taken from their general assets or are to be received from the United States in payment for the property. It would seem that the cost of reconstructing the line in a new location would not be a proper element entering into the value of the property taken by the United States, if permission to relocate cannot be obtained; and that an uneconomic outlay of funds would not be in the interests of transportation even though the money be derived from the national government.

■ We are not unmindful of the loss that will be inflicted upon the coal corporation by the abandonment of the line. It is suggested in the reports of the Commission that justice demands that the corpora-

tion be paid for the injury which it will suffer. But this is a matter beyond the scope of the present inquiry. While the Commission may consider the Coal Corporation's loss in making its determination, its decision will have no effect upon the right of the Coal Company to compensation, if any there be. Nor will the decision of this court prejudice the Coal Corporation in this respect.

An order will be signed dismissing the bill of complaint.