## UNITED STATES v. 43.7 ACRES OF LAND IN GARRETT COUNTY, MD., et al.

### No. 1470.

District Court, D. Maryland.

Jan. 24, 1942.

Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., and Elliott W. Finkel, Sp. Asst. U. S. Atty., of Pittsburgh, Pa., for the United States.

Joseph Sherbow, of Baltimore, Md., for Public Service Comm. of Maryland.

Miles & O'Brien, Clarence W. Miles, Seymour O'Brien, and Benjamin C. Howard, all of Baltimore, Md., for McCullough Coal Corporation.

COLEMAN, District Judge.

The question presented is whether the Government, in the present condemnation proceedings, brought under the Act of Congress approved July 18, 1918, Title 33 U.S.C.A. § 594, as made applicable to Flood Control by the Act of Congress approved August 18, 1941, Public No. 228, Ch. 377, 77th Cong., 1st Sess., § 6, 33 U.S.C.A. § 701c—2, is entitled to immediate possession of some 43 acres of land in Garrett County, Maryland, belonging to the Confluence and Oakland Railroad Company, which is a wholly owned subsidiary of the Baltimore and Ohio Railroad Company, and is operated by it as lessee. The proposed taking is in connection with the construction of the Youghiogheny Dam and Reservoir near Confluence, Pennsylvania, authorized by the Flood Control Act of June 28, 1938, 33 U.S.C.A. § 701c—1.

On December 30, 1941, the Government petitioned for possession on January 15th of the property sought to be condemned. But this petition was denied, without prejudice, however, to the right to offer further proof in its support. On January 9th, the United States, by oral motion, renewed its request for possession of the property on or about January 15th. Further proof, arguments and briefs have been submitted.

This matter is so intimately related to the previous proceedings in this District between the same parties before a statutory three judge court, and to the appeal by the McCullough Coal Corporation and the Public Service Commission of Maryland, from that court's decision (Purcell v. United States, D.C., 41 F.Supp. 309), now pending in the Supreme Court, that the present status of the parties and the property in controversy, as a result of that decision, must be carefully examined and weighed.

The appeal just referred to was allowed by order of the three judge court on No-

vember 5, 1941, and, as has been said, is now pending before the Supreme Court of the United States. The three judge court, by its further order of the same date, granted a stay during the appeal with specific provision that, pending the Supreme Court's decision on the appeal, the Baltimore and Ohio Railroad Company and the Confluence and Oakland Railroad Company were enjoined from abandoning the operation of the railroad whose right of way is embraced in the land herein sought to be condemned. This order is now a part of the record in the case before the Supreme Court. The record on this appeal has been transmitted, the Court has noted jurisdiction, and, at the request of the Solicitor General of the United States, by agreement with the defendants, the appeal has been advanced for argument on February 9th.

This court has granted leave to the Mc-Cullough Coal Corporation, because of its connection with the prior litigation, to intervene in the present condemnation proceedings. The Public Service Commission is also before the Court, it having been named as a party in interest in the Government's petition for condemnation.

Pursuant to a stipulation of counsel for the Government and the defendants, there has been filed in the present proceedings a transcript of proceedings before the United States District Court for the Western District of Pennsylvania in United States v. 75.2 Acres of Land in the Borough Confluence, et al. —— F.Supp. ——, including a memorandum opinion of District Judge Gibson. These proceedings were commenced by the Government filing on December 24th, last, a petition for condemnation of the portion of the property of the Confluence and Oakland Railroad Company lying in the State of Pennsylvania. On the same day the Court in Pennsylvania entered two orders: the first fixing January 8th as the date on which all parties in interest should appear and file such answers or other pleadings as might be appropriate, and on which they would be heard on such pleadings as might be filed; and the second fixing the same date for a hearing on the prayer of the Government for possession, on January 15th, 1942, of the property to be condemned.

On January 8, 1942 the defendant, Mc-Cullough Coal Corporation, appeared by counsel in the District Court in Pennsylvania and filed a motion for leave to intervene. The Government having opposed the granting of this motion, the Court, denied it on the ground, among others, that the Government sought no property of McCullough Coal Corporation, and that the asserted injury to it was consequential and therefore not one upon which it could base an action against the Government. The Court, however, permitted counsel for McCullough Coal Corporation to state its position and to fully argue the questions involved, but reserved its decision upon the petition until the similar petition in this Court for possession had been fully heard and considered. The Court's position is succinctly stated in the closing paragraph of its memorandum opinion, as follows: "The proceeding in this District and that in Maryland relate to the same subject matter and are so closely related that conflicting decisions in the two Districts are exceedingly undesirable. This Court, therefore, will reserve its decision upon the petition until the like Maryland petition has been fully heard and considered by the court there. We are informed that a re-hearing upon that petition has been fixed for on or about the 12th instant."

In the proceedings before the three judge court on the bill filed in September, 1941, by the McCullough Coal Corporation and the Public Service Commission of Maryland, to enjoin the abandonment of the railroad now sought to be condemned, the Government was a party and fully argued the case as then presented. The procedure which the Government had elected to follow, namely, through an application to the Interstate Commerce Commission filed by the Baltimore and Ohio Railroad Company for a certificate authorizing the abandonment of the railroad and a private sale of it to the Government, was fully discussed, and counsel for the Government was questioned regarding it by the Court. In response to specific questions by the Court, and after conferring with engineers who were present, counsel for the Government stated that they were content to follow the procedure which had been inaugurated and pending for more than a year, and to pursue the abandonment proceedings to a final conclusion; and that the Government would not, and did not want to condemn, the railroad's property, although it had full right so to do. It was stated in open Court that the delay incident to the appeal would not seriously embar-

rass the Government, and that it was determined to see the matter through in the proceeding which was then pending.

In view of the foregoing, the present condemnation proceedings came as a complete surprise not only to the defendants, who were not notified that such were even contemplated until December 23, 1941, although the related proceedings were instituted in Pennsylvania the following day, but also to this Court and to the two other judges who had constituted the statutory court, none of whom was given the slightest intimation of the Government's intention to attempt to condemn, until December 29th. Even more surprising is that the record of the proceedings in Pennsylvania discloses that as early as October 4, 1941, the Government had not only contemplated condemning the property in question, but had secretly entered into a formal agreement on that date with the Baltimore and Ohio Railroad Company and the Confluence and Oakland Railroad Company, by which the amount of damages to be assessed in such condemnation proceedings was fixed and determined, and provision made whereby the Baltimore and Ohio Railroad Company and the Confluence and Oakland Railroad Company should have a fixed period of ninety days within which to remove their tracks and obtain the salvage value of their equipment after the property passed into the possession of the Government.

Thus, notwithstanding the representations which had been made to the statutory court by counsel for the Government as we have set it forth, and notwithstanding the total lack of any disclosure whatever on the part of the Government or either of the railroad companies of their subsequent agreement made with respect to condemnation proceedings, the appeal in the abandonment proceedings was taken, and on November 5, 1941, the order was entered staying the abandonment of the operations of the railroad. This order was submitted to, and acquiesced in by counsel for the Government; no objection was made to it and not the slightest indication was given to this Court or to the defendants that the Government intended to circumvent the appeal by proceeding to condemn the railroad's property. There was no suggestion then, albeit there had been some, in the early stages of the hearing before the statutory court, that possession of the railroad property might be urgently required by the Government prior to a determination of the questions presented by the appeal to the Supreme Court. On the contrary, both the Court and counsel for the defendants were given to believe that the appeal would be argued when the same was reached in its preferred order on the docket of the Supreme Court, and that the operation of the railroad would not be interfered with in the interim.

In spite of the aforegoing facts, the United States contends that it is entitled to take immediate possession of the railroad; that this right is absolute under the Act of Congress approved July 18, 1918, 33 U.S.C.A. § 594, as made applicable to matters of flood control by Act of Congress approved August 18, 1941, Public No. 228, Ch. 377, 77th Cong., 1st Sess., § 6, 33 U.S.C.A. § 701c—2, certain and adequate provision having been made for the ultimate payment of just compensation for the taking, through funds now available from the appropriation entitled "Flood Control", War Department Civil Appropriation Act, 1942, approved May 23, 1941, Public No. 71, Ch. 130, 77th Cong. 1st Session, 55 Stat. 190; that the United States cannot be precluded, by the stay order of the statutory court in the proceedings now on appeal to the Supreme Court of the United States, from condemning and taking immediate possession of the Railroad under the power of eminent domain in furtherance of the Flood Control Project authorized by Congress; that the McCullough Coal Corporation, although allowed to intervene in this proceeding, has no proprietary interest in the Railroad, condemnation and immediate possession of which is sought; that the damages which the Coal Corporation alleges it will suffer by the taking are consequential for which there may be no recovery; and finally, that, independently of the Government's absolute right to immediate possession, the public interest requires the granting of such immediate possession, because the consequences which will result to the public interest if the Government is delayed in the prosecution of the Youghiogheny River Reservoir Project by denying it the right to take immediate possession of the railroad, are of such magnitude as to far outweigh any consequences that may be suffered by the Coal Corporation or other interests, by reason of the Government being granted the right to take immediate possession, it being asserted that unless

possession of the railroad is given to the Government without further delay, construction of the Youghiogheny Dam will probably be delayed for approximately one year, and that this delay will result in a loss during that time of all of the essential functions and consequent public benefits from its use as a multiple purpose dam, namely, flood control, low water regulation, pollution abatement, and its likely adoption as a source of electric power.

Replying to the aforegoing, the Coal Corporation and the Public Service Commission of Maryland contend that because of what has occurred as a result of the abandonment proceedings in this court, now on appeal to the Supreme Court of the United States, the Government is estopped to demand possession of the railroad property at this time, and that such demand is fraught with bad faith. In short, it is contended that the procedure which has been adopted by the Government for obtaining possession of the railroad property is an attempt to secure from this court, by indirect means, what could not lawfully be obtained by direct means. It is pointed out that in the abandonment proceedings the Government sought immediate cessation of the railroad's operations in order that the Government might carry out its private contract with the railroad and purchase the latter's property; and although the statutory court decided that the Interstate Commerce Commission was justified in granting the railroad the right to abandon its operations, that court, nevertheless, in allowing an appeal to the Supreme Court, required, by its stay order, that the railroad's operations be continued until the Supreme Court had acted upon the appeal; and that, therefore, the Supreme Court, having noted jurisdiction of the appeal and having assigned it for argument on February 9th next, this court is without power to nullify the previous action of the statutory court and terminate the railroad's operations while this appeal is still pending.

More specifically, it is argued for the Coal Corporation and the Public Service Commission of Maryland, that should the Government be granted immediate possession of the railroad property, the appeal now pending before the Supreme Court may become moot, and a decision upon the appeal entirely futile. It is pointed out that the purpose of such appeal, and of the entire proceedings that had taken place before the Interstate Commerce Commission and the statutory court, was to prevent the abandonment of the railroad's operations unless and until the railroad was relocated; that once these operations are stopped and the tracks and other facilities removed, a decision that the railroad's operations should not have been abandoned would be of little comfort to the Coal Corporation and to the community involved; and that, indeed, if the fact of abandonment and removal of the railroad facilities were made known to the Supreme Court, it might well decline to hear the appeal, on the ground that the question involved had become moot and that a decision thereon was no longer necessary.

It is contended that the only theory on which the appeal would not be moot is that, although the railroad operations had been abandoned, the Court might still order a relocation of the same to be accomplished in the future, but that, as a practical matter, this would deprive the Coal Corporation and the public now served by the railroad of all of their rights for an indefinite time, if not permanently, with no ultimate redress whatsoever. In short, it is contended that termination of the railroad's operations will, of necessity, cause a simultaneous termination of operations of the mine of the Coal Corporation and of its business generally, as well as of the business of the community served by the railroad, all of which would be so disrupted that recovery might be impossible, even though relocation of the railroad might be accomplished some time in the future. It is pointed out that while the Interstate Commerce Commission has undoubted authority to condition the abandonment of service by a railroad by requiring that the road's facilities be relocated, the Commission may be without power to require such relocation if service is, in fact, no longer being furnished; and that a determination of whether or not the service being rendered is necessary, can only be made if the service is continued. Finally, it is contended that under the provisions of the Flood Control Act, the relocation of the railroad is mandatory, and that an interruption of its service resulting from an order of condemnation in the present proceeding, without provision for relocation, would defeat the purposes of that law.

It will be seen that, when reduced to simple statement, the contention of the Government is that nothing which has been or

may be done in a proceeding in which a railroad is seeking permission of the Interstate Commerce Commission voluntarily to abandon a line of operation can have any effect upon the sovereign power of the United States, in the exercise of its right of eminent domain, to take possession of such railroad and thereby cease the operation of such line.

With this proposition we cannot agree, when applied to the particular and quite unusual facts before us. The three judge statutory court decided adversely to the contention of the Coal Corporation and the Public Service Commission of Maryland, an appeal has been taken from this decision and pending a determination of that appeal, the three judge statutory court has given to the Coal Corporation and the Public Service Commission the benefit of a stay order, that is, it has directed that the matter shall remain in status quo. Without attempting to determine whether there are any instances in which a lower court may have power to nullify previous action in a case over which, upon appeal, an appellate court has assumed jurisdiction, we conclude that to do what we are asked by the Government to do in the present case would be tantamount to condoning a breach of faith on the part of the Government which we cannot do.

The Coal Corporation, the Public Service Commission of Maryland and the statutory three judge court, were all given to understand in very definite terms by the Government that not only did the Government reject condemnation proceedings as the means whereby it might acquire the railroad property in question, even though as early as January, 1940, the War Department had been asked to proceed by condemnation, but at all times during and subsequent to the proceedings before the statutory court, and following the latter's orders granting the appeal and the stay, the Government gave assurances, both to the other parties litigant and to the court, that it, the Government, was content to bide its time until the Supreme Court might render a decision on the appeal. Nevertheless, it appears that as early as October 4th, 1941, that is, only three days after the case was heard and while it was still sub curia, and nearly a month before the stay order was entered on November 5, the Government secretly entered into a formal agreement with the Baltimore and Ohio Railroad Company and its subsidiary, whose property is now sought to be condemned and immediately taken, stipulating the amount of damages to be assessed in the event of condemnation proceedings, and the time within which the railroad should remove its tracks and obtain the salvage value of its equipment. This shift was not only made without any disclosure to the other parties litigant or to the court, but, as far as we can find from the record before us, it is not based upon any change in the conditions or problems involved in the construction of the dam from what they were during the previous proceedings and up to the time when the stay order was granted.

The Government is now contending that unless possession of the railroad be given on or about January 15th, construction of the dam will probably be delayed for approximately one year, and that this delay will result in a loss during that time of all the essential functions and consequent benefits of its use as a multiple purpose dam, and its likely adoption as a source of electric power. That is to say, it is contended that unless the contractor is permitted to begin construction of the dam on or about April 1st next, and to continue construction at a rapid rate until November 1st next, when bad weather would set in, construction must be entirely called off for the year 1942, for the reason that if it is not possible by November 1st next to build the embankment to an elevation of 1,365 feet, a serious downstream hazard would be created as well as a hazard to the project itself, inviting destruction by the Spring floods to be anticipated in 1943, of the entire structure in place up to that time.

But all of this was known or should have been known by the Government at the time when it consented to and became subject to the stay order pending the appeal. Furthermore, while it might have been reasonable for the Government engineers to have assumed that a decision by the Supreme Court would be rendered prior to April 1st next, it certainly was never reasonable for them to assume that possession of the railroad property as early as January 15th was possible in view of the pending court proceedings and agreement of the parties. Nor can the matter fairly be placed upon any question of National

352

Defense or military necessity. Such are clearly not involved. In short, it is apparent that the present position of the Government is due essentially to the fact that the War Department engineers appear to have miscalculated the time within which they contemplated that the court proceedings would be completely ended and construction of the dam might go forward unhampered. But the Government must deal fairly and aboveboard with individuals and corporations, just as the Government expects the latter to deal with it. It is not reasonable for the Government to expect this court to lend its aid to an attempt to ride roughshod, so to speak, over the rights of the other parties in the litigation. We like to assume that the railroads fully accept this fact as evidenced by the fact that, in spite of the agreement of October 4, 1941, counsel for the railroads have taken no affirmative position to support the Government's present contention. And in using the word "rights", we do not mean that the Coal Corporation has necessarily any interest for which it is entitled to compensation, should the railroad be either lawfully abandoned or condemned. This question is not before us, and we do not attempt to pass upon it. We use the word "rights" in a broader sense, meaning the right of our citizens to fair treatment at the hands of the Government and those in privity with it; their right to take, for their face value, and to rely upon, all representations made by duly authorized officials of the Government in the course of their official duties. Even if it be assumed that, in no event, under no form of proceeding, will the Coal Corporation or the community now served by the railroad be entitled to compensation for the losses suffered, should the railroad service be discontinued, either by abandonment or condemnation, and no substitute service be given, still all such considerations are beside the real point, which is that, notwithstanding whatever may occur, these parties litigant are entitled to have their cause heard and decided as the Government and the railroad gave them to understand would be done, without attempted interference by them. The judicial process, once fairly invoked, must be kept inviolate in all its stages, without fear or favor. Resort to it would indeed become an empty privilege if capable of being emasculated either by the caprice or preference of Government officials, or by a showing of economy or any other public interest, barring only the actual necessities of war.

For the foregoing reasons, the motion of the Government is denied.