TRANSIT COMMISSION et al. *v.* UNITED STATES et al.

No. 498. Argued November 24, 25, 1931.—Decided January 4, 1932.

*Mr. George H. Stover,* with whom *Messrs. John J. Bennett, Jr., Edward M. Deegan,* and *Charles Dickerman Williams* were on the brief, for appellants.

*Assistant to the Attorney General O'Brian,* with whom *Solicitor General Thacher* and *Messrs. Charles H. Weston, Hammond E. Chaffetz, Daniel W. Knowlton,* and *Edward M. Reidy* were on the brief, for the United States and Interstate Commerce Commission, appellees.

*Mr. Alfred A. Gardner*, with whom *Mr. Joseph F. Keany* was on the brief, for the Long Island Railroad Co., appellee.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

This appeal involves the validity of a certificate of public convenience and necessity of the Interstate Commerce Commission, permitting the abandonment by Long Island Railroad Company of a portion of its Whitestone branch. Separate bills were filed by appellants to enjoin action by the railroad and to adjudge the certificate void. They were consolidated and heard by a specially constituted

district court.[1] The parties having stipulated that they had offered all the proofs they desired to present, the court refused an interlocutory injunction, and dismissed the bills.

The Long Island Railroad Company, chartered under the laws of New York, whose lines lie wholly within that state, transports passengers and freight in interstate commerce by the use of steam and electricity. Its Whitestone branch extends a distance of 4.7 miles from the Port Washington branch to the Flushing River, and thence to Whitestone Landing. The bulk of its passenger traffic is intrastate, and only a slight amount interstate; but it carries a considerable volume of freight, seventy-five per cent. of which is interstate. In these respects the branch is representative of conditions throughout the system. There are five passenger stations on the branch line,— Flushing, which is much the largest, and four others beyond.

In January, 1928, the city of New York opened a rapid transit line connecting Flushing with Manhattan. There ensued a thirty-three per cent. decrease in the passenger revenue of the Whitestone branch; and its operating deficit of some $18,000 for 1927 increased to over $125,000 in 1928. There was a further decrease of over twenty-six per cent. in passenger revenue in the first five months of 1929.

On June 2, 1926, the Transit Commission, pursuant to a program of grade crossing abolition, ordered the elimination of four in and near Flushing. There are twelve such crossings on the entire branch, removal of all of which was in contemplation, and it was estimated that to remove them would cost about $4,000,000, the company's share being $2,000,000, which it could borrow from the state at from four to five per cent. interest. The elimination of

---

[1] Pursuant to U. S. C., Tit. 28, § 47.

the crossings would save $37,000 per year now spent for guarding them. On December 31, 1928, the total value of land and improvements on the portion of the branch sought to be abandoned was approximately $933,000.

The company did not appeal from the order, as it might have done, but formally offered to quit-claim to the city of New York that portion of the branch which is involved in this proceeding. The city did not accept the proffer. The effective date of the grade separation order was postponed to December 31, 1928, and upon the Transit Commission's refusal further to extend the time for compliance, the company, on January 10, 1929, filed with the Interstate Commerce Commission its application under § 1 (18) of the Interstate Commerce Act, as amended by the Transportation Act of 1920,[2] for a certificate permitting the abandonment of the 4.1 miles of the branch extending from west of Flushing River to the terminus at Whitestone Landing. After interventions by the Transit Commission, the city of New York, and others, the matter was heard by an examiner, whose proposed report was the subject of argument before Division 4 of the Commission. It found in favor of the application, and ordered that a certificate issue.[3]

During the hearing the company proposed that it would substitute truck service for the freight traffic to be affected by the abandonment, and would, if a franchise were granted it by the city of New York, inaugurate a passenger bus service to the towns on the branch, which would connect them with its station at Flushing and with the terminus of the city's rapid transit line to Manhattan.

A reargument was granted before the full Commission, which affirmed[4] the report of Division 4. Since, however, the interveners expressed some doubt as to the com-

---

[2] U. S. C., Tit. 49, § 1 (18).   [4] 166 I. C. C. 671.
[3] 162 I. C. C. 363.

pany's making satisfactory arrangements for bus service, the Commission indefinitely suspended the order, to afford opportunity for negotiating the proposed bus franchise. The company promptly applied to the proper authorities, agreeing to take a grant terminable at short notice and on terms favorable both to the city and to the traveling public. No response was made to its offer and no action was taken on its application. After waiting five months, it applied to the Commission to take final action, setting forth the neglect of the city to act in the matter. Thereupon the Commission ordered that its certificate should take effect 120 days from June 17, 1931.[5]

By their bills the state of New York and the Transit Commission challenge the power of the Interstate Commerce Commission to issue a certificate of public convenience and necessity in such a case as is here presented, and assert that if it has such power, the proofs do not warrant its action.

*First.* It is claimed that the certificate has as its sole basis the order of the State Transit Commission for the removal of grade crossings; that the latter was valid and within the state's Constitutional right, regardless of its effect on interstate commerce, and that the Interstate Commerce Commission cannot destroy or impair this right, or hamper its exercise, by authorizing an abandonment of the railroad's line. We think this assertion is based upon a misconception of the Commission's action. In ascertaining the public convenience and necessity the Commission was bound to weigh the benefit to accrue to interstate commerce by the abandonment against the resultant prejudice and injury to intrastate commerce. *Colorado* v. *United States*, 271 U. S. 153, 168. The finding was that continued operation would result in a serious and increasing depletion of revenue, due to the competi-

---

[5] 175 I. C. C. 163.

tion by the city's rapid transit lines and their probable extension, which would entail an unreasonable burden on interstate commerce. It was found that the expenditure for removal of grade crossings would, in the circumstances, be a waste of the company's funds, and that the requirement of the State Transit Commission removed all doubt of the propriety of abandonment of the branch. The magnitude of the required outlay as compared with the value of the whole property, and the resulting effect on the company's revenue, were facts properly taken into account in passing on the application. Compare *Oregon R. & N. Co.* v. *Fairchild*, 224 U. S. 510, 529; *Lehigh Valley R. Co.* v. *Board of Commissioners*, 278 U. S. 24, 34; *New Orleans Public Service* v. *New Orleans*, 281 U. S. 682, 687.

In reaching these conclusions the Commission considered the needs of the communities served, and gave due regard to them. It was shown that the city authorities had refused to take over the line, when the company offered to convey it, on the ground that the territory could be adequately served by bus transportation. Moreover, the company could not maintain satisfactory schedules on the branch, because of congestion in the tunnels under the East River, and without better schedules could not hope to increase use of this line. It was in evidence that the company's offer to establish an adequate bus system had not been accepted by the city authorities. There was other proof, which need not be detailed, as to the intrastate traffic needs. All these matters were given due consideration by the Commission in reaching its ultimate conclusion. It followed the course outlined in *Colorado* v. *United States, supra;* and the claim that its action was beyond its authority and without warrant of law cannot be sustained. That decision requires a holding that appellant's assertion of unconstitutional invasion of the State's sovereignty is without merit. We need not elaborate what was there said on the subject (271 U. S. 165).

*Second.* Appellants insist that the Commission's findings and conclusions, assuming that its order was within its powers, lack support in the evidence. They say the proofs show the continued operation of the branch will not prejudice, burden, obstruct, or interfere with interstate commerce, or lessen the ability of the carrier to serve that commerce, and since it is shown that the abandonment will cause prejudice to several communities, the certificate should not have been granted. There is no contradiction of the fact that the branch is operating at a serious loss, as shown by the carrier's accounts offered in evidence, and that this will continue and increase from year to year and be aggravated by expenditures for the removal of grade crossings. Appellants criticize the allocation of certain rentals and overheads by the company, and point to evidence produced by them indicating that the operating losses are in fact much less than those claimed by the carrier. The Commission, however, concluded that the railroad's figures came nearer representing the true situation than those offered by the interveners. The latter further assert that the intrastate passenger traffic of the railroad constitutes by far the greater and more profitable portion of its business; that the interstate traffic represents only about sixteen per cent. of its gross revenue and is unprofitable; that the system as a whole has large net earnings and is a successful enterprise; and that the Commission was in error in considering incidental and dependent interstate traffic as an excuse for federal interference with a highly remunerative local traffic. They seek thus to distinguish the present case from *Colorado* v. *United States, supra,* and assert that the Commission ignored the test there approved and acted upon the erroneous theory that proof that the continuance of the Whitestone branch would constitute a burden on interstate commerce was unnecessary.

We do not so read the Commission's report. That body professed to follow the decision in the *Colorado* case and

we think that it did so. The Court there held that, in the issuance of a certificate of public convenience and necessity, the Commission need not determine with mathematical exactness the extent of the burden imposed upon interstate commerce by the operation of a branch line; that such burden might involve various elements, and that if upon the whole proof the conclusion was warranted that continued operation would in fact unreasonably burden the interstate commerce of the carrier, the Commission was justified in authorizing abandonment. There, as here, the system lay wholly within the state and was prosperous, and no claim was made that immediate abandonment of the local branch was necessary to enable the carrier to earn a reasonable return on its investment. Here, as in the *Colorado* case, the Commission had regard for the needs of intrastate as well as interstate commerce. The evidence was ample to give a comprehensive view of the entire situation, and due weight was accorded all of the proofs in the light of the conflicting requirements. The contention that the Commission went upon the theory that it might authorize abandonment in disregard of the evidence is not supported by the record. The judgment must be

*Affirmed.*