**BOARD OF PUBLIC UTILITY COMMISSIONERS OF the State of NEW JERSEY and the State of New Jersey, Plaintiffs,**

v.

**UNITED STATES of America, Interstate Commerce Commission, Defendants.**

Civ. A. No. 225-55.

United States District Court
D. New Jersey.
June 18, 1955.

©⎯331

Grover C. Richman, Jr., Atty. Gen. of New Jersey, for plaintiff.

Augustus Nasmith, Hoboken, N. J., for defendant Delaware, Lackawanna & Western R. Co. and Hoboken Ferry Co.

John R. Sailer, Elizabeth, N. J., for Lee L. Glezen and Citizens Transit Committee, applicants for intervention.

BIGGS, Circuit Judge, and SMITH and MEANEY, District Judges.

BIGGS, Circuit Judge.

The Interstate Commerce Commission, Division 4, on November 10, 1954, issued a certificate of public convenience and necessity in the Delaware, Lackawanna & Western Railroad Company et al. Ferry Abandonment, Finance Docket No. 18324, permitting the "abandonment by The Hoboken Ferry Company, and abandonment of operation by The Delaware, Lackawanna and Western Railroad Company, of the ferry line between Hoboken, Hudson County, N. J., and Christopher Street, Borough of Manhattan, City and County of New York, N. Y." On March 15, 1955, the State of New Jersey and the Board of Public Utility Commissioners of that State brought this action against the United States and the Interstate Commerce Commission under 28 U.S.C. § 2321 et seq., to suspend, enjoin, annul, and set aside the Commission order. As required by 28 U.S.C. § 2325, the action was heard by a three-judge district court constituted according to 28 U.S.C. § 2284. An individual, Lee L. Glezen, and a Citizens Transit Committee sought leave to intervene as plaintiffs, and The Delaware, Lackawanna and Western Railroad Company and The Hoboken Ferry Company asked to be allowed to intervene as defendants.

The Delaware, Lackawanna and Western Railroad Company, a Pennsylvania corporation, operates rail lines in Pennsylvania, New Jersey, and New York, with an eastern terminal in Hoboken, New Jersey. The Hoboken Ferry Company, a New Jersey corporation, owns ferry properties located at Hoboken, New Jersey. The Railroad owns the en-

tire capital stock of Hoboken and leases its properties and franchises at an annual rental equal to Hoboken's yearly expenditures and property depreciation charges. With these facilities, the Railroad at one time operated three ferry lines from the Railroad's Hoboken terminal across the Hudson River to Manhattan, one to 23rd Street, the second to Barclay Street, and the third to Christopher Street, Manhattan. In 1946, the 23rd Street line was discontinued on the authority of a certificate of abandonment issued by the Commission, 267 I.C.C. 51, and this action was sustained by a three-judge district court in the Southern District of New York in an unpublished opinion, Civil Action No. 39–370 (1947). The Railroad continued to operate the Barclay and Christopher Street lines.

## I. Prior Proceedings.

On November 12, 1953, the Railroad and Hoboken filed a joint application with the Interstate Commerce Commission for authority to abandon ferry service on the Christopher Street line. A hearing was held before an examiner of the Interstate Commerce Commission on April 5th through the 8th, 1954, and the New Jersey Board of Public Utility Commissioners, the Citizens Transit Committee, and others who have not sought to intervene in this suit appeared in opposition to the application. The examiner issued a proposed report recommending that abandonment be allowed, and exceptions and replies to this report were filed. On November 10, 1954, Division 4 of the Interstate Commerce Commission issued its report and order, finding that "the present and future public convenience and necessity permit abandonment" and allowing ferry operations to cease forty days from the date of the order.

Petitions for reconsideration were then addressed to the full Commission and on December 10th the Commission stayed the effective date of the order until further disposition of the matter. On January 17, 1955, the petitions were denied and March 15, 1955, was fixed as the effective date of the order allowing discontinuance of the ferry. At the request of a Judge of this court, the Commission voluntarily extended this date to March 30, 1955. After hearing the State of New Jersey and the Board of Public Utility Commissioners (the only parties then appearing to oppose the abandonment), this court on March 28, 1955, refused to issue a temporary injunction prohibiting abandonment pending a final disposition of the controversy because the State and the Board stated that they were unable to give bond as required. See Rule 65(c), Fed.Rules Civ.Proc. 28 U.S.C.A. On April 12, 1955, the court heard arguments on the merits from all parties who desired to make them, decision on the right of the Railroad, Hoboken, Glezen and the Transit Committee to intervene being then reserved.

## II. Standing to Sue.

The requirement that Commission approval of the abandonment of these ferry facilities be obtained is derived from the Interstate Commerce Act, Chapter 1 of 49 U.S.C.A. Section 1(18) provides in part that "no carrier by railroad subject to this chapter shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity permit of such abandonment." Section 1(3) defines "The term 'railroad' as used in * * * [the chapter to] include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad." Since Hoboken is a ferry owned by the Railroad carrier and operated in conjunction with it for continuous carriage, it was necessary and proper for application to be made to the Commission under 49 U. S.C.A. § 1(18) for a certificate authorizing abandonment of ferry operations.

It is contended here that New Jersey and its Board of Public Utility Commissioners have no standing to maintain a suit attacking the action of the Commis-

sion on the application properly made to it.

In different types of cases involving plaintiffs other than state authorities, the criteria of standing to attack an order of the Commission have not been clearly revealed. Compare City of New York v. United States, D.C.E.D.N.Y. 1921, 272 F. 768, with Jersey City v. United States, D.C.N.J.1950, 101 F.Supp. 702. Section 2323, 28 U.S.C., does provide that "any party or parties in interest to the proceeding before the Commission, in which an order or requirement is made, may appear as parties of their own motion and as of right, and be represented by their counsel, in any action involving the validity of such order or requirement or any part thereof, and the interest of such party." This provision, however, has been interpreted not to confer automatically a right on any party before the Commission to institute and maintain a suit attacking Commission action. See Alexander Sprunt & Son, Inc., v. United States, 1930, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832, and Pittsburgh & West Virginia Railway Company v. United States, 1930, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980. But see Baltimore & Ohio Railroad Co. v. United States, 1924, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667.

██ Nevertheless, in this case there is pertinent statutory authority, 49 U.S.C.A. § 1(20), expressly allowing the maintenance of this action. See Goldman, Standing to Challenge Orders of the I.C.C., 9 Geo. Wash. L.Rev. 648, 679 (1941). It provides: "Any construction, operation, or abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of the United States, the commission, any commission or regulating body of the State or States affected, or any party in interest; * * *" Although this provision could have been interpreted to be applicable only when there was a construction or abandonment without the authority of a Commission certificate,

the statute was held in Claiborne-Annapolis Ferry Co. v. United States, 1932, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808, to allow suit when a certificate has been granted by the Commission. At page 392 of 285 U.S., at page 443 of 52 S.Ct. of its opinion, the Supreme Court said: "The inhibition applies where there is no certificate in fact, or where the commission lacked power to grant the outstanding one because of insufficient evidence to support its findings or other reason. An invalid certificate would leave the situation as though none had issued." Thus, the Board of Public Utility Commissioners, which is a "commission or regulating body of the State * * * affected" within the terms of the statute and which participated in the proceedings before the Commission, clearly has standing to maintain this action. See Transit Commission v. United States, 1932, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342. And since the State controls the Board and ultimately, as *parens patriae*, is as interested in the proceedings as the Board, the State has the necessary status as a "party in interest" to participate in this action along with its Board of Public Utility Commissioners. See State of Colorado v. United States, 1926, 271 U.S. 153, 46 S.Ct. 452, 70 L.Ed. 878.

█ No challenge has been made to the right of the Transit Committee and Glezen to intervene as plaintiffs and the right of Hoboken and the Railroad to intervene as defendants. Section 2323, 28 U.S.C., provides that " * * * any party or parties in interest to the proceeding before the Commission, in which an order or requirement is made, may appear as parties of their own motion and as of right, * * * in any action involving the validity of such order * * * and the interest of such party" and that "Communities, associations, corporations, firms, and individuals interested in the controversy or question before the Commission, or in any action commenced under the aforesaid sections may intervene in said action at any time after commencement

thereof." Consequently, the applications to intervene must be allowed.

### III. Fact Findings by the Commission.

■ On the merits, the contentions of these plaintiffs are primarily three. They argue that Division 4 of the Commission made unwarranted and insufficient findings of fact, that it applied inappropriate standards in reaching its conclusion, and that it failed to rule on certain contentions of the parties opposing the abandonment. We find no merit in any of these arguments.

The report of Division 4 contains complete, detailed findings of fact which the plaintiffs have not in any way shown to be unsupported by substantial evidence on the record considered as a whole. In summary, the Division found that the Christopher Street ferry has sustained substantial losses during recent years. With total revenues for the years 1948–1953 respectively of $356,000, $324,000, $295,000, $295,000, $293,000, and $238,-000, the ferry incurred net deficits in these respective years of $371,000, $206,-000, $311,000, $357,000, $448,000, and $252,000. On the other hand, the Division found that a substantial segment of the ferry's passengers would by its abandonment be put to a greater expenditure of money and time for transportation. Although there are alternative routes such as the Hudson and Manhattan railroad tubes which to particular destinations would not take any more time than the ferry, most ferry passengers would have to spend ten to twenty minutes longer and approximately 40 cents more per day in commuting.

The plaintiffs attack the findings that there have been net deficits in the ferry operations by arguing that the accounting methods used by the Railroad to establish the deficits were faulty. In fixing its rail fares, the Railroad included an amount for ferry service in the fares of all railroad passengers traveling to or from Hoboken. Although all of these Railroad passengers were entitled to ferry service, in practice only about fifty percent of the rail passengers used the ferries, and the Railroad therefore allocated to the ferries only fifty percent of the revenue collected from rail passengers for ferry service. Concerning this, the plaintiffs argue that "Without the Ferry operation the Lackawanna could not charge passengers on their railroads for River crossing and all such charges should be credited to the Ferry operation." The Commission, however, rejected this contention on sheet 19 of its report: "Applicants' unchallenged evidence indicated that only 50 percent of the railroad passengers to and from Hoboken used the ferries, and we have consistently held that the allocation of revenues on an actual, rather than a potential basis, is proper. But even if the ferry revenues were computed on the basis of 100 percent of the railroad passengers purchasing New York tickets, and assigning 13.2 percent thereof to the Christopher Street ferry as indicated by the actual counts compiled, the revenues produced would be less than the $43,632 allocated for the service by the applicants."

Although the argument of plaintiffs is appealing, it is based on the assumption, without foundation in this record, that the Railroad could not exact the same fare that it is now charging without offering Christopher Street ferry service because either the traffic would not bear it or necessary governmental approval could not be obtained. Actually it seems realistic to allocate fifty percent of the ferry charge included in rail fares to rail revenue and not to ferry revenue if fifty percent of the rail passengers are willing to pay a fare including the ferry charge exclusively for rail travel. At any rate, the question is really one of accounting standards, and according to the Commission the deference due its judgment in such matters, we cannot say that the method approved by it is so arbitrary as to warrant rejection.

Of the fifty percent of the ferry fee charged rail passengers that was actually allocated as ferry revenue, 19.5 percent was allocated to the Christopher

Street ferry and 80.5 percent to the Barclay Street ferry. Citing sheet 5 of the Commission report where the factual basis for this allocation between the ferries was found to be sufficient, the plaintiffs argue that "Both the Hearing Examiner and the Commission approved of Lackawanna's apportionment to the Christopher Street Ferry revenues derived from motor vehicular traffic [which was also carried by the ferries] on the basis of 19$\frac{5}{10}$% of all revenues received from motor vehicular traffic" whereas Christopher Street actually carried 36 percent of the vehicle traffic. This argument is defective, however, because sheet 5 of the report does not show that only 19.5 percent of the revenue collected for vehicle passage was allocated to the Christopher Street ferry. Sheet 5 merely shows that Christopher Street carried 19.5 percent or less of all the railroad passengers using the ferries, and sheet 7 of the report reveals that this percentage was used for apportioning between Barclay Street and Christopher Street the revenue collected from rail passengers allocable to the ferries. It nowhere appears that this percentage was used in apportioning the revenue from vehicle carriage. At sheet 9 the Division states that "Revenue for vehicles represents tariff charges for passenger automobiles and trucks carried on the ferry," and the foundation for this statement is at pages 163–164 of the Transcript where the Comptroller of the Railroad testified that "Account 115 is the revenue received from vehicles using the Christopher Street Ferry, * * *." Therefore, the argument of the plaintiffs that there was an improper allocation of revenue from vehicle traffic is without merit.

In addition, the plaintiffs argue that erroneous accounting methods were used in showing the deficit because "* * * the Lackawanna admitted that 50% of a second boat's operating expenses and 20% of the operating expenses of a third boat were included in $473,228 charged by the Lackawanna to the 1-boat operation on the Christopher Street Ferry. These costs which approximate $200,000 cannot be recoverable even though the Christopher Street Ferry is abandoned, since these two boats will be required for the Barclay Street operation." But the plaintiffs do not accurately describe the situation by referring to the Christopher Street service as a "1-boat operation." At sheet 3, the Division found on the basis of substantial evidence that a second boat is used at Christopher Street for "nonscheduled service of five round trips a day for the transportation of explosives and other dangerous articles" and that a "third boat is assigned to the Christopher Street service for relief purposes in case of a breakdown and when the regularly scheduled boat is in dry dock for annual overhaul." Thus, the Christopher Street operation actually employs three boats. And the method of accounting for the operating costs of these boats is revealed by the findings at sheet 9 of the report: "Operating expenses shown in the financial data submitted by the applicants are out-of-pocket costs. * * * These cost figures are actual, except account 323, floating equipment repairs, account 331, equipment depreciation, account 333, insurance, and account 408, operating floating equipment, which were apportioned to the Christopher Street ferry line on the basis of boat-hours, inasmuch as the boats often are used interchangeably between the two ferry lines." These findings are supported adequately by the evidence and reveal a method of allocating costs between the Barclay and Christopher lines that seems completely fair. The plaintiffs' statement that "these two boats will be required for the Barclay Street operation" is merely a prediction which may not come true, and even if it does, it is not a reason for disregarding that portion of the costs of operating these boats actually attributable to their service on the Christopher Street line.

No defects in any of the Railroad's accounting methods have been demonstrated and the findings of the Division that the Christopher Street operation

has incurred deficits, computed on the basis of those methods, must be accepted.

### IV. Standards Applied by the Commission.

In making its ultimate decision on the basis of these findings of fact the plaintiffs contend that the Division has applied improper standards. In State of Colorado v. United States, supra, 1926, 271 U.S. at pages 168–169, 46 S.Ct. at page 456, Mr. Justice Brandeis specified the standards applicable to such a determination: "The sole test prescribed is that abandonment be consistent with public necessity and convenience. In determining whether it is, the Commission must have regard to the needs of both intrastate and interstate commerce; for it was a purpose of Transportation Act 1920 to establish and maintain adequate service for both. * * * The benefit to one of the abandonment must . be weighed against the inconvenience and loss to which the other will thereby be subjected. Conversely, the benefits to particular communities and commerce of continued operation must be weighed against the burden thereby imposed upon other commerce. * * * The result of this weighing—the judgment of the Commission—is expressed by its order granting or denying the certificate. * * * In that balancing, the fact of demonstrated prejudice to interstate commerce and the absence of earnings adequate to afford reasonable compensation are, of course, relevant and may often be controlling." And in a more recent case involving the abandonment of an unprofitable branch of a railroad, State of North Carolina v. United States, D.C.M.D.N.C.1954, 124 F.Supp. 529, 532, Chief Judge Parker of the Fourth Circuit, sitting as a member of a three-judge court, reiterated the applicability of this test: "In view of the losses unquestionably sustained in the operation of the southern portion of the line and the expense which must be incurred to keep that portion in operation, it cannot reasonably be said that the order of the Commission was without support in the findings or in the evidence; and whether the prospective loss to the public and shippers from discontinuance of the line was sufficient to counterbalance the loss to the railway company and the burden on interstate commerce which would result from its continued operation is a matter which Congress has committed to the judgment of the Commission."

That the Commission, by Division 4, arrived at a decision by this balancing process referred to in the two decisions last cited is clear from its report which reveals the reasons for its conclusions. At sheet 22 of its report, it said:

"It is apparent from the record that abandonment of the applicants' Christopher Street ferry is warranted. Alternate routes are available for crossing the Hudson River between Hoboken and Manhattan, and the terminal of the Barclay Street ferry, which the applicants will continue to operate around the clock, is only about 1.25 miles south of the terminal at Christopher Street. With the opening of the bridge and tunnels across the river, travel between New Jersey and New York City by motor vehicle has risen in increasing volume. Instead of increasing proportionately, or at least holding its own, the Christopher Street ferry participation in this added traffic shows a steady decline. In fact the record clearly indicates that all ferries are rapidly passing out of the trans-Hudson transportation picture.

"Doubtless, the commuters relying regularly on the Christopher Street ferry for transportation to and from their places of employment will be inconvenienced by its abandonment in the form of increased costs and additional travel time via alternative routes, but such public inconvenience is limited to relatively few persons employed or engaged in business in a small area of Manhattan adjacent to the ferry terminal. These persons cannot reasonably expect the ferry service to be continued for their convenience at the expense of large annual losses to the applicants. Such losses have continued for many years,

and there is no indication that they will not persist in the future. Nor is it feasible to insist upon applicants further operation of the ferry indefinitely until such time as a general overall substitute means of transportation can be devised. Under all the circumstances, continued operation of the Christopher Street ferry line would impose an undue and unnecessary burden upon the applicants and upon interstate commerce."

And at sheet 21 of the report it was said: "We cannot agree that the standard used by the Supreme Court of the United States in the Colorado case is not applicable here. It is under the theory of that case that the abandonment of the Christopher Street ferry should be permitted. When the riders of the ferry can use an alternate route from the same terminal in New Jersey to a terminal in New York only a little more than a mile from the dock of the service sought to be abandoned, the requirements of their convenience and necessity are reasonably satisfied and the applicants should not be forced to subsidize further the operation to Christopher Street."

V. Rulings by the Commission on the Contentions of the Parties.

 The plaintiffs argue nonetheless that the Division failed in its duty to rule on their argument made as an exception to the examiner's report that ferry service be "continued subject to payment of a supplemental fare of 10 cents per railroad passenger." A survey conducted by the Transit Committee did reveal that about 80 percent of a fair sample of ferry passengers indicated their willingness to pay up to a ten cents additional fare per trip to keep the ferry running. See sheet 12 of the report. However, the Division found at sheet 18 of its report that "It is apparent from the record that the present and prospective future volume of traffic available to the Christopher Street ferry cannot support a fare increase sufficiently large to offset the losses to be incurred from continued operation." In view of the size of the deficit being incurred by the Christopher Street operation, there is ample support for this finding of the Division, and the finding itself is an adequate ruling on the plaintiffs' contention.

Division 4 considered both the interest of the Railroad and that of the traveling public and concluded on a rational basis that the public interest generally will be furthered by an abandonment of the ferry. Since the Commission is the expert in balancing the considerations in this field and since it has not done so arbitrarily, its decision must be upheld.

The findings of fact of Division 4 of the Commission are adopted by this court. Our conclusions of law are expressed in this opinion.

The complaint will be dismissed for want of equity.