268 F.2d 327
 Dr. George R. GORDON, Albert E. Levenson and Dr. Hurley J. Knight, as Members of the Creditors Committee, In the Matter of John Raymond Lucas d/b/a Lucas & Company, Bankrupt, Appellants,
v.
Versal SPALDING, Jr., Claimant, Appellee.
 No. 17451.
 United States Court of Appeals Fifth Circuit.
 June 29, 1959.
 
 Robert S. Gordon, Chas. Cleveland, Birmingham, Ala., for appellants.
 Sam C. Pointer, Sam C. Pointer, Jr., Birmingham, Ala., for appellee.
 Before RIVES, CAMERON and WISDOM, Circuit Judges.
 CAMERON, Circuit Judge.
 
 
 1
 This appeal is from the judgment of the court below ratifying and affirming an order of the Referee awarding to appellee the sum of $3,550.00 in the hands of the Trustee in Bankruptcy of John Raymond Lucas.
 
 
 2
 John R. Lucas filed a petition in bankruptcy April 25, 1956, and Frank S. Blackford was appointed trustee. Appellants Dr. George R. Gordon, Albert E. Levenson and Dr. Hurley J. Knight were named as members of a creditors committee in connection with the special fund here involved. Appellee Versal Spalding, Jr. was the owner by assignment of the claim of Charlie Thompson and Otis Brown who, for themselves and others, had paid the bankrupt $3,550.00 as the purchase price of one hundred shares of the capital stock of Vulcan Life & Accident Insurance Company a short time before the petition in bankruptcy was filed. Appellee filed, and the Referee allowed over the objection of the trustee and of the Creditors Committee, a Claim for Reclamation[1] of this $3,550.00 and, as stated, the court below denied appellants' petition for review.
 
 
 3
 The facts as found by the Referee are these: The bankrupt was engaged in the general business of a stockbroker. On Aug. 30, 1956, he confirmed the sale of 100 shares of common stock of Vulcan at a price of $3,550.00 to Charlie Thompson and Otis R. Brown,[2] noting on the purchase order that it had been sold to Thompson. The bankrupt had purchased the stock in his own name from a dealer in Montgomery, Alabama. Upon the arrival of the stock in Birmingham, with sight draft attached, the bankrupt sold it to another for $100.00 less than he had purchased it for.
 
 
 4
 The stock arrived in Birmingham Sept. 7th and, the next day, the bankrupt called Thompson and Brown on the telephone asking them to mail him the purchase money. They mailed him, Sept. 11th, a certified check on Hamilton National Bank of Chattanooga, Tenn. When the bankrupt received the certified check on the Chattanooga bank he deposited it in his account at the Bank for Savings & Trusts, Birmingham, Ala., and it was cleared through regular channels and he was given credit for this amount on Sept. 12th.
 
 
 5
 Sept. 13th, the Birmingham bank closed out the account by issuing its cashier's check to the bankrupt in the sum of $7,735.32. But, at the request of the vice president of said bank, the bankrupt returned the cashier's check and the bank deducted $4,000.00 to cover an item in the bankrupt's account upon which payment had been stopped; and the bank issued to the bankrupt another cashier's check dated September 19, 1956 for $3,639.44, closing out the account. Upon the filing of the petition in bankruptcy on Sept. 25, 1956, the bankrupt turned this check over to his attorney, who in turn delivered it to the trustee in bankruptcy, and it was deposited by him in a separate account.
 
 
 6
 Upon these facts the Referee found that "The Bankrupt committed a conversion and fraud on said purchasers, and acquired no title to the funds so received and deposited and under the Doctrine of Constructive Trusts the title and beneficial ownership of the said funds remained in Thompson and Brown, who received nothing therefor and are entitled to rescind." He held further that "such a short time elapsed between the time of the deposit of the cashier's check on Sept. 12th and the bankruptcy on Sept. 25th that no question of the right of bona fide purchasers or creditors extending credit on the strength of the bankruptcy's ownership of said funds is presented."[3]
 
 
 7
 This holding of the Referee is in accord with established principles governing such matters. A good illustration of their application is found in the recent case of Jaffke, Petitioner v. Dunham, Trustee of Knetzer, 7 Cir., 1956, 229 F. 2d 232, reversed by the Supreme Court 1957, 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed. 2d 314. Jaffke, along with a number of others, was induced by Knetzer's fraud to advance him a large amount of money subsequent to his bankruptcy. Upon a reclamation proceeding under Illinois law the trustee in bankruptcy was ordered by the referee to pay to Jaffke the sum of $27,400.00. The district court affirmed upon its finding that this amount had come into the possession of the trustee. The Court of Appeals, while recognizing the propriety of the reclamation proceeding, reversed, holding that there was no competent proof that this money had come into the hands of the trustee in bankruptcy. The Supreme Court disagreed and sent the case back for a determination under the law of Illinois of the question whether the trustee in bankruptcy had received from Jaffke the money obtained by the fraud of the bankrupt.[4]
 
 
 8
 Under slightly different facts the Circuit Court of Appeals for the Second Circuit[5] approved the recovery in a reclamation proceeding under New York law of the value of merchandise obtained by the bankrupt holding that recovery could be had of the goods in specie or of their value or proceeds.[6]
 
 
 9
 The Referee in the case before us held that the Doctrine of Constructive Trust is firmly embedded in the law of Alabama,[7] and that appellee was entitled to reclaim under that doctrine. Appellants do not take issue with this portion of the Referee's findings. On the other hand, appellants base their entire argument upon the assertion that the bankrupt was a "stockbroker" within the purview of § 60, sub. e(1) of the Bankruptcy Act, 11 U.S.C.A. § 96, sub. e(1); and that, since under subsection (4) the money cannot be specifically identified, it should be held in a separate fund by the trustee and should be disbursed ratably under the provisions of subsection (2) of § 60, sub. e of the said Act. We are not able to agree with appellants' contentions because, in our opinion, the bankrupt, in the handling of the transaction before us, was not a stockbroker within the contemplation of said § 60, sub. e(1).
 
 
 10
 A stockbroker is defined[8] as "a person who acts as an agent in buying and selling stocks and bonds." Lucas was not, in purchasing this stock, acting as an agent. He purchased the stock outright in his own name, and he had confirmed a sale of it to appellee's assignors. Instead, he made an outright sale to another. It is clear, therefore, that he was acting throughout as principal in a transaction of purchase and sale. This concept not only inheres in the nature of the deal, but the bankrupt stated categorically when being questioned that, in this entire transaction, he acted as principal.
 
 
 11
 The history as well as the text[9] of said § 60, sub. e(1) indicates clearly that it was intended to apply only to those who hold securities on margin and otherwise, not as owners, but as agents for their customers.
 
 
 12
 Both parties rely on the decision of the Circuit Court of Appeals of the Third Circuit, 1941, In re McMillan, Rapp & Co., 123 F.2d 428, 138 A.L.R. 765, affirming the action of a district court of Pennsylvania in a series of cases[10] in awarding reclamation of securities to the customers of a bankrupt. In McMillan the bankrupt was engaged in the business of a merchant, buying and selling securities. But in some instances it acted as stockbroker.[11] This extended quotation from McMillan points out clearly these two things: (1) every transaction is judged by its own character and ingredients and acquires its legal status from these alone; (2) whether the bankrupt is a merchant of securities or a stockbroker in the usual sense is to be determined, not from the name he applies to his business, but to the nature of his transaction which is brought under judicial scrutiny.
 
 
 13
 Here, the situation is the converse of that which faced the court in McMillan. The bankrupt here conducted his business regularly and usually as a stockbroker. But he purchased and sold some securities as principal. The transaction involved here was, as stated, one where he bought and contracted to sell the stock as principal, and § 60, sub. e(1) does not apply to it. This being true and it appearing that the Referee was amply justified in finding that the bankrupt had defrauded appellee's assignors and that the money paid by them to the bankrupt had gone into the hands of the trustee, it was recoverable under the Alabama law governing constructive trusts.
 
 
 14
 It results that the district court was correct in denying the petition to review the order of the Referee, and its judgment so doing is affirmed.
 
 
 15
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Appellee first filed a Preferred Claim and, before hearing, substituted a Reclamation Petition for enforcement of a constructive trust. The Referee consolidated the two and considered the claim as one for reclamation
 
 
 [2]
 Thompson and Brown made the purchase on behalf of a larger group residing in Chattanooga, Tennessee. Upon being advised of the fraud perpetrated upon them by the bankrupt, appellee Versal Spalding, Jr., an officer of Vulcan, made good the purchase of the stock by delivering at his own expense 100 shares of Vulcan stock to Thompson and Brown, taking an assignment and transfer of their claim against the bankrupt estate
 
 
 [3]
 Citing 4 Collier on Bankruptcy, 14th Edition, Par. 70.41, pp. 1207-1208: "The law of contracts in most states permits rescission by a party who was induced to enter into a contract by a fraudulent or innocent misrepresentation. * * * The intervention of bankruptcy between bargain and rescission has not been allowed to interfere with the right to rescind and reclaim; the trustee in bankruptcy takes title to the bankrupt's property subject to the retroactive divestment effected by such a rescission * * Most of the issues in bankruptcy cases involving the right to rescission are variations on a single theme: does the act complained of give rise to a right to rescission under the local law? * * *"
 
 
 [4]
 The case was heard again by the Court of Appeals for the Seventh Circuit, which reaffirmed that the proffered evidence was inadmissible under Illinois law, and that there was, therefore, no proof available to show that money ever went to the trustee (see 243 F.2d 460), and the Supreme Court denied certiorari, 355 U.S. 835, 78 S.Ct. 55, 2 L.Ed.2d 46. But the principle of law here considered was not questioned in any of the opinions. In its second decision the Court of the Seventh Circuit stated (243 F.2d at page 461): "There is, and could be, no real dispute between the parties that the petioner, under the facts of this case, was entitled to reclaim from the funds in the hands of the trustee in bankruptcy such amount, if any, as the bankrupt obtained from the petitioner by fraud and then traced into the hands of the trustee. * * *"
 
 
 [5]
 In re Liebig, Petition of Holley, 1918, 255 F. 458
 
 
 [6]
 And see also Donaldson, Assignee v. Farwell, 1876, 93 U.S. 631, 23 L.Ed. 993; Mulhern v. Albin, 8 Cir., 1947, 163 F. 2d 41; Elbro Knitting Mills v. Schwartz, 6 Cir., 1929, 30 F.2d 10; In re Sherman, 2 Cir., 1926, 13 F.2d 121; In the Matter of Bentzel, Bankrupt, U.S.D.C. Md.1958, 161 F.Supp. 219; and In the Matter of Van Meter, Bankrupt, D.C. W.D.Ark.1955, 135 F.Supp. 781
 
 
 [7]
 Citing Kent v. Dean, 128 Ala. 600, 609, 30 So. 543; Manning v. Pippen, 86 Ala. 357, 5 So. 572; Moore v. Crawford, 130 U.S. 122, 9 S.Ct. 447, 32 L.Ed. 878 and 2 Pomeroy, Equity, pp. 1053 and 1955, from which an extensive quotation is made
 
 
 [8]
 Webster's New World Dictionary, College Edition, p. 1436
 
 
 [9]
 "Where the bankrupt is a stockbroker, the following definitions and provisions of this subdivision shall apply: `Property' shall include cash, securities, whether or not negotiable, and all other property of similar character; `customers' of a stockbroker shall include persons who have claims on account of securities received, acquired, or held by the stockbroker from or for the account of such persons (a) for safekeeping, or (b) with a view to sale, or (c) to cover consummated sales, or (d) pursuant to purchases, or (e) as collateral security, or (f) by way of loans of securities by such persons to the stockbroker, and shall include persons who have claims against the stockbroker arising out of sales or conversions of such securities; `cash customers' shall mean customers entitled to immediate possession of such securities without the payment of any sum to the stockbroker; * * * the `net equity' of a customer's account shall be determined by excluding any specifically identifiable securities reclaimable by the customer and by subtracting the indebtedness of the customer to the stockbroker from the sum which would have been owing by the stockbroker to the customer had the stockbroker liquidated, by sale or purchase on the date of the bankrutcy, the remaining securities or security commitments of the customer."
 
 
 [10]
 38 F.Supp. 40, 41, 43, 45
 
 
 [11]
 Said the Court of the Third Circuit, (123 F.2d at page 429, et seq.):
 "Notwithstanding the bankrupt had generally conducted an investment business and, consequently, had ordinarily acted as principal and not as agent, it is plain that, in respect of the stock purchases involved in the present appeals, the bankrupt acted as broker or agent for these claimants. It follows, as a matter of law, that the instant claims are subject to the provisions of Section 60, sub. e. * * *
 "Section 60, sub. e is new, having been introduced into the bankruptcy law by the Chandler Act. So far as we are advised, paragraph (4) has not heretofore been judicially construed except by the District Court in the instant cases. Clearly, the purpose of the provision was to correct a very definite and well-recognized situation. Prior to the enactment of Section 60, sub. e, inequalities had developed in the distribution of a stockbroker's estate in bankruptcy due to the fact that some purchasers of stock on margin or depositors of stock or other property were able to lift their stocks or property from the possession of the bankrupt's estate upon paying any debit balances due by them, while others were left with nothing more than claims as general creditors of the bankrupt because there was insufficient stock of a particular kind in the estate or none at all to allocate to their accounts. So that, although two customers stood in the same relation to the stockbroker as the owners of stock acquired or held for them subject to debit balances, one was able, upon the stockbroker's bankruptcy, to obtain preferential treatment over the other depending upon the mere accident of circumstances.
 "* * * The effect of Section 60, sub. e was to place all margin customers of a stockbroker in a single and separate class whose participation in the distribution of the stockbroker's estate in bankruptcy is limited to the single and separate fund composed of the proceeds of such customer's property, rightfully transferred or unlawfully converted by the stockbroker, and in which fund such customers share ratably according to their respective net equities as of the date of bankruptcy. * * *"
 
 
 
 16
 RIVES, Circuit Judge (dissenting).
 
 
 17
 The bankrupt was, in my opinion, a stockbroker and was acting as a stockbroker when he received the check for $3,550.00 from the claimant's assignors. The claimant, the trustee in bankruptcy, and the bankrupt entered into a stipulation of facts including the following:
 
 
 18
 "1. On and prior to September 3rd, 1956, the Bankrupt, John Raymond Lucas, was engaged in business in Birmingham, Alabama, as a stockbroker.
 
 
 19
 "2. On some date between August 27, 1956 and September 3rd, 1956, said Bankrupt accepted an order from Charlie Thompson and Otis R. Brown of Chattanooga, Tennessee for the purchase of 100 shares of the Common Stock of Vulcan Life & Accident Insurance Company at a price of $3,550.00, which said stock the Bankrupt had on order and had purchased from Sellers, Doe & Bonham of Montgomery, Alabama, which said sale of said stock the Bankrupt confirmed to Thompson and Brown about said dates by written instrument of confirmation."
 
 The referee's first finding of fact was:
 
 20
 "1. The bankrupt as a stockbroker a few days after September 3, 1956, confirmed the sale of One Hundred (100) shares of common stock of Vulcan Life and Accident Insurance Company at a price of Three Thousand Five Hundred Fifty ($3550.00) Dollars to Charlie Thompson and Otis R. Brown, which stock the bankrupt had purchased from a dealer in Montgomery, Alabama."
 
 The bankrupt testified:
 
 21
 "Q. Did you receive an order for the 100 shares, or did you first offer a hundred shares of Vulcan Life & Accident Company at thirty-five and a half? A. Yes, sir; I did.
 
 
 22
 "Q. Did you have the stock at that time? A. The stock at that time had been bought either the day or two days previously.
 
 
 23
 * * * * * *
 
 
 24
 "Q. But you had sold the 100 shares of stock before you received the check? A. That is right. It was necessary.
 
 
 25
 "Q. You did not return the check? A. No, sir."
 
 
 26
 The fact that the stock was ordered in the bankrupt's name a day or two days before it was sold to claimant's assignors did not remove the transaction from the bankrupt's ordinary business of stockbroker. So far as appears, claimant's assignors dealt with him as a stockbroker.
 
 
 27
 The dictionary definition of "stockbroker"[1] adopted by the majority is certainly too narrow and restricted. Collier quotes the same definition but notes other definitions.[2] In my view, Collier correctly states: "This term should, therefore, be given its common, accepted meaning, provided this harmonizes with the general context and objective of subdivision e." 3 Collier, 14th ed., p. 1079.
 
 
 28
 A similar problem was discussed by the district court and by the Third Circuit in In re McMillan, Rapp & Co., D.C. E.D.Pa.1941, 38 F.Supp. 40, 41, affirmed 3 Cir., 1941, 123 F.2d 428, 429, 430, and both courts agreed that that bankrupt was a stockbroker. My understanding is that stockbrokers often keep securities on hand for immediate sale and delivery to their customers at the then current market. In such transactions they do not cease to act as stockbrokers because they may make a profit or loss exclusive of their commission, or because, as a mere conduit, they are temporarily owners of the securities. The narrow definition adopted by the majority will, in my opinion, unduly restrict and, in large part, emasculate the operation of Section 60, sub. e.
 
 
 29
 In applying Section 60, sub. e, it may be helpful first to trace the relative rights and priorities of the parties under Alabama law. Certainly when, after he had already sold the stock, the bankrupt received the check and deposited it to his own account, he committed a wrong, and I would agree, under the cases cited in footnote 7 to the majority opinion, that the bankrupt held the proceeds of the check under a constructive trust. It is nonetheless essential that the proceeds of the check "be kept in view, traced, and ultimately located in some particular batch of money," before "it or its equivalent in value may be recovered by the wronged cestui que trust." Robinson v. Williams, 1935, 229 Ala. 692, 159 So. 239, 241; see also, Maryland Casualty Co. v. Williams, 1935, 229 Ala. 663, 159 So. 242, 244; compare 9 C.J.S. Banks and Banking §§ 531, 531b. When $3,550.00 was added to the bankrupt's bank account on September 12, 1956, he already had on deposit $3,794.33 and his total balance was raised to $7,344.43. The next day, September 13, he deposited an additional $700.00 so that his total balance would be $8,044.43. For that amount the relation of creditor and debtor existed between the bankrupt and the bank. Ex parte First National Bank of Montgomery, 1921, 206 Ala. 394, 90 So. 340, 341. The $8,044.43 balance was thereafter debited with five items in the following amounts: $1.71, $9.68, $297.72, $95.88, and $4,000.00, or an aggregate of $4,404.99, leaving the balance of $3,639.44 which reached the hands of the trustee in bankruptcy. Actually, there is no way to trace the proceeds of the check into this $3,639.44. We are cited to no authority for the application of the fiction of last-in last-out, and in any event its application would authorize a recovery of $2,939.44 instead of the full $3,550.00.
 
 
 30
 The law of the State of Alabama, as I understand it, required that the proceeds of the check be traced into the $3,639.44 which reached the hands of the trustee in bankruptcy. Paragraphs 2 and 4 of Section 60, sub. e of the Bankruptcy Act would seem to require that, to be specifically identified, the certified check[3] or its proceeds must remain "in its (or their) identical form in the stockbroker's possession until the date of bankruptcy." I see no material difference in the application of the two tests to the facts of this case.
 
 
 31
 If there should be a difference, it seems clear to me that Section 60, sub. e controls, for as was well said in In re Chicago Rapid Transit Co., 7 Cir., 1942, 129 F. 2d 1, 4:
 
 
 32
 "Sole jurisdiction in bankruptcy is by the Constitution lodged in the National Government. That power, when given expression in legislation by Congress is paramount and transcends and supersedes all inconsistent state laws. State of Colorado v. United States, 271 U.S. 153, 162-166, 46 S.Ct. 452, 70 L.Ed. 878; Transit Commission of State of New York v. United States, 284 U.S. 360, 52 S.Ct. 157, 76 L.Ed. 342; State of New York v. United States, 257 U.S. 591, 42 S.Ct. 239, 66 L.Ed. 385; American Brake Shoe & Foundry Co. v. Interborough Rapid Transit Co., D.C., 10 F.Supp. 512; affirmed, 2 Cir., 76 F.2d 1002, certiorari denied New York City v. Murray, 295 U.S. 760, 55 S.Ct. 923, 79 L.Ed. 1702.
 
 
 33
 "Congress has not thus far attempted to reach the utmost horizon of the power. Under existing bankruptcy legislation, contractual relationships and obligations may be discharged; under certain circumstances judgments valid under the state law set aside; preferences otherwise valid abrogated, and debts composed and settled for less than their face value. Even before the more recent extensions of bankruptcy jurisdiction by Sections 75, 77 and 77B, 11 U.S.C.A. §§ 203, 205, 207, a trustee was allowed to abandon assets deemed valueless and, in operation and maintenance of the assets, in liquidation and in equitable division of proceeds, to reject burdensome leases. All these are forceful illustrations of the farreaching extent of this paramount federal power. The power to rid the trust estate of exorbitant unjustified expenditures and thereby to protect its beneficiaries, the creditors, is incidental to the power to fix the rights of creditors as of the date of attachment of jurisdiction in bankruptcy and to liquidate the assets and divide them ratably among beneficiaries. * * *"
 
 
 34
 To date the occasions for the application of Section 60, sub. e have, fortunately, been few indeed. Paragraphs 2 and 4 of that section will ultimately present some real problems of construction to be solved by the courts. See 3 Collier on Bankruptcy, 14th ed., pp. 1086, 1087. Certainly, however, we are not authorized to question the wisdom of Congress in enacting Section 60, sub. e, and it is our duty to apply it to cases coming within its letter and spirit. This seems to me such a case. With genuine deference to the views of the majority, I think that the judgment should be reversed, and therefore respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 "A person who acts as an agent in buying and selling stocks and bonds."
 
 
 [2]
 "The quoted provision is taken from Webster. He also adds the following definition: `A dealer in negotiable securities, esp. stocks and bonds such as are dealt in by stock exchanges.' Other common definitions are: `Those employed to buy and sell stocks and bonds of incorporated companies, and government bonds.' — Bouvier (Rawle's 3d rev.); `A stockbroker is a broker who, for a commission, attends to the purchase and sale of stocks or shares, and of government and other securities, in behalf and for the account of clients.' — 23 Am. & Eng.Ency. of Law (1st ed.) 700. See also 40 Words and Phrases [Stockbroker] (1940) 173." Collier, 14th ed., Vol. 3, ¶ 60.73, n. 6, p. 1079
 
 
 [3]
 Both the stock earmarked for the claimant's assignors and the certified check which they sent to the stockbroker seem to me to be "securities" within the meaning of Section 60, sub. e. As to the stock, however, claimant's assignors did not become "cash customers," because the stockbroker had disposed of it before they became "entitled to its immediate possession." They were then entitled to a prompt return of their certified check. I think, therefore, that the claimant has pursued the right security or its proceeds