HOBSON, Justice
(concurring specially).
Although I concur in the result reached in the majority opinion I feel compelled for reasons which I will hereinafter make apparent to express my views in a separate opinion.
*737 My primary objection to the majority opinion is the fact that it is stated therein: “It is fundamental in these cases that, in order to abandon such a public service, it is necessary to show not only that such facility is operated at a loss but that such loss affects substantially the overall operation of the company.”
Such a rule is an innovation in the law of Florida. No authority is cited to support this so-called fundamental rule and I can find none which could be said to apply to the facts of this case. The true rule to be applied in cases such as this can be gleaned from the following statement appearing in the case of State v. Georgia Southern & F. Ry. Co., 139 Fla. 115, 190 So. 527, 530, 123 A.L.R. 914:
“The service of one mixed passenger and freight train each way every day except Sundays is a primary and imperative statutory duty which should be rendered in the interest of the public necessity for adequate local service even though the particular service is rendered at a relatively small financial loss, when it appears that the Company’s entire system has substantial net earnings over all operating expenses, and it is not clearly shown that the loss in rendering the particular local service is so out of proportion to the reasonable public necessity required to be met under the primary duties of the railroad company, as to operate as an unlawful deprivation of property rights of the appellee company.” (Italics supplied.)
The use of the conjunctive “and” in the above statement makes it manifest that this court in the above cited case based its decision requiring continued service by the railroad on the existence of two separate and distinct factors: (1) That there was a public necessity for adequate local service and the entire system had substantial net earnings notwithstanding a relatively small loss over the route in question, and (2) that the company had not shown that its losses in rendering the particular local service was grossly disproportionate to the reasonable public necessity for such service. The clear inference to be derived from this statement is that the railroad would have prevailed in its quest to curtail the local service in question if it could have made a favorable showing as to either of the separate controlling factors. Thus the general rules deducible from the above case may be restated as follows: (1) Where reasonable public necessity demands continuance of a particular local service which is being rendered by a carrier at a relatively small financial loss, the carrier will not be permitted to abandon or curtail such service if its entire system has substantial net earnings over all operating expenses. (2) However, if the operating losses suffered in rendering the particular local service are grossly disproportionate to the public convenience and necessity in regard to the service in question, then abandonment of such service should be permitted, notwithstanding the fact that the carrier’s overall operation is enjoying substantial profits. In general support of this second rule, see Transit Commission v. United States, 284 U.S. 360, 367, 52 S.Ct. 157, 76 L.Ed 342, and other cases collected in Section 13 of the annotation in 10 A.L.R.2d 1121 at page 1149. Contained in this annotation are the following statements:
“The fact that a public utility as a whole has large net earnings and is a profitable enterprise does not automatically deprive the utility of its right to abandon an unprofitable branch line if other circumstances warrant such a step.”
“One of the main factors in determining whether or not it would be unreasonable to deny to a public utility company the permission to abandon an unprofitable branch line is the effect such abandonment would have on the general public. Only if the inconvenience which the public would suffer as a result of the abandonment is of a relatively minor nature, will the utility *738 company be deemed justified in the relinquishment of an unprofitable-branch line.”
It is with the failure of the majority opinion to recognize the existence of this second rule that I disagree so strongly. That opinion, in my judgment, would close the door on the efforts of a carrier to abandon a branch line merely because of the failure to show that the loss suffered in the operation of the branch “affects substantially the overall operation of the company”.
It has been suggested that I have taken out of context the statement in the majority opinion which I again quote: “It is fundamental in these cases that, in order to abandon such a public service, it is necessary to show not only that such facility is operated at a loss but that such loss affects substantially the overall operation of the company.” It may be true that I have taken the above quotation out of context in the sense that I have singled it out. However this is of no consequence because it inaugurates a novel rule and there is nothing preceding such statement or following it which modifies it in the slightest degree. Moreover, as heretofore stated, no authority is cited in support of this so-called “fundamental” rule which means that the majority of this court has established it “on his [its] man” so to speak. It cannot therefore, in any event, be classified as “fundamental”.
Under the more than dubious “fundamental” rule pronounced in the majority opinion a carrier could be forced to'continue operations into a “ghost town” where no public convenience or necessity exists merely because it could not show that its losses substantially affect its overall operation.
It is inconceivable to my mind that a certificated common carrier should be required to show that it is on the brink of failure before being permitted to abandon an operation which serves the public convenience and necessity only slightly as compared to the financial losses which the carrier is sustaining in the continuance of the service even where its operation sought to be abandoned extends to a terminal point such as Cedar Key.
The underlying basic principle — the yard stick if you please — which controls the Railroad and Public Utilities Commission-in the determination of an application for a certificate is that “public convenience and necessity requires such operation”. Section 323.03, F.S.A. This same principle should also be the governing factor where an application is made to abandon a part of a carrier’s operation, and if the public convenience and necessity is slight compared to the financial losses which a certificated common carrier is suffering in the operation of a particular portion or phase of its business, abandonment of that portion should be permitted notwithstanding the fact that the utility in its overall operation is not facing bankruptcy.
In light of these principles, it follows that the instant case should not be disposed of upon the mere failure of petitioner to relate its operating losses over the route in question to its overall operation. We should delve deeper and weigh public convenience and necessity in the affected area against the carrier’s local operating losses.
The granting of petitioner’s application would result in a considerable curtailment of public transportation services along the entire affected route, and would render it very inconvenient, if not impossible, to travel from some of the affected towns to others under present schedules. However, the only portion of the route which would be left entirely without public transportation is state road 24 between Otter Creek and Cedar Key, a space of approximately 22 miles.
The town of Cedar Key, according to evidence brought out at the hearing, has a population of a little more than 1100 persons. At the present time it is experiencing a growth rate of approximately five to six per cent a year. There was testimony that many of the inhabitants of Cedar Key are financially unable to afford private auto *739 mobiles and that therefore they depend for travel to other towns upon public transportation or upon the kindness of their more fortunate neighbors who own some type of conveyance. Cedar Key is without a doctor or druggist, and therefore the inhabitants have occasion to use petitioner’s passenger and freight service for transportation to the medical center in Gainesville and for the purpose of having medicine and drugs transported from Gainesville into Cedar Key. There was also testimony that Gaines-ville is the shopping area for the inhabitants of Cedar Key and that various business enterprises in Cedar Key are dependent upon the bus package express. It does appear, however, that in the event of the discontinuance of petitioner’s service in Cedar Key there would still be express service by another carrier approximately twice a week. Cedar Key is a fishing resort and it appears that on occasions visitors to the town use petitioner’s passenger service. The extent of the use of petitioner’s passenger service into and out of Cedar Key was shown by testimony and exhibits introduced by the petitioner which reflect that over a representative period of time the bus into and out of Cedar Key averaged slightly less than one passenger per day.
Even though it appears that on the average less than one passenger per day uses the petitioner’s bus service, it is nonetheless apparent that public convenience and necessity is being served by the operation of petitioner’s line to some degree. This is especially true in light of the fact that if the petitioner’s application is granted the town of Cedar Key will be without other means of public transportation. In accordance with the rules of law stated previously, the degree of public convenience and necessity must be weighed against the financial loss which petitioner is suffering by virtue of the continued operation of its transportation system over the route involved.
It appeared from petitioner’s evidence that during 1958 petitioner suffered a loss of approximately $1,400 per month in operating its busses between the points in question and that during the first nine months of 1959 the loss averaged approximately $1,700 per month. The petitioner introduced into evidence figures as to its revenue and costs per bus mile covering two previous periods of time in 1958 and 1959. There was a conflict in testimony as to whether these periods were representative of petitioner’s costs and revenue over the entire period in question. However, the evidence showed that for these brief periods of time the revenue per bus mile averaged 13f! as compared to approximately 45^ per bus mile cost. During the course of oral argument before this court counsel for petitioner was questioned as to the possibility of reducing Greyhound’s operational costs by putting on a smaller bus, less expensive in initial cost and less expensive in operation, to serve at least a portion of the routes involved. The response to this appears less than satisfactory, it being that the company’s repair shops were not equipped to maintain any type of bus other than the large expensive busses now in use. There would appear to be a distinct possibility that Greyhound could reduce its operational expenditure by such methods and it does not appear from the record that they have made any attempt to do so. Furthermore, giving full regard to the factors mentioned previously regarding public convenience and necessity in the area in question and applying the statutory presumption in favor of the validity of orders of the Railroad and Public Utilities Commission, I am unable to say that the petitioner made a sufficient showing to justify this court’s overruling the order of the commission. Butler v. Carter, Fla., 123 So.2d 313. For these reasons I concur in the affirmance of the commission’s order although I disagree strongly with the reasons for such affirmance stated in the majority opinion.